## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**LOWELL SIBLEY, *et al.*,**

**Plaintiffs,**

v.

**ISLAMIC REPUBLIC OF IRAN, *et al.*,**

**Defendants.**

Civil Action No. 23-600 (JEB)

---

## MEMORANDUM OPINION

This case arises out of the United States's twenty-year war in Afghanistan. Plaintiffs are Americans who were wounded in that war, their family members, and the estates and families of those killed. Seeking recompense for their own injuries or for the wounds or death of a loved one, they have sued the Islamic Republic of Iran and some of its instrumentalities, arguing that they are liable for the pain and suffering resulting from the attacks. After Iran failed to appear, default was entered. It now falls to the Court to determine whether to award default judgment.

The Court declines to do so because Plaintiffs have not, at least at this point, overcome Iran's sovereign immunity. They rely on the terrorism exception to the Foreign Sovereign Immunities Act, which would abrogate Iran's immunity if, among other things, its provision of material support were a substantial factor leading to the attacks that caused the injuries or deaths here. This requirement is met, Plaintiffs contend, because (i) the Taliban perpetrated the attacks in question, and (ii) Iran's provision of safe haven, training, weaponry, and money to the group was indeed a substantial factor leading to the attacks. While Plaintiffs may eventually be able to establish these claims, they have thus far fallen short of doing so. The Court will therefore deny without prejudice their Motion for Default Judgment and several related Motions.

1

## I.    Background

This suit was brought in March 2023 by more than 150 Plaintiffs seeking redress for the pain and suffering they endure as a result of their own or their loved one's service in the Afghanistan War.  See ECF No. 30 (Mot. for Damages) at 1.  Plaintiffs are servicemembers, civilian employees of the U.S. Government, or Government contractors who were wounded while serving in Afghanistan between 2001 and 2015; their family members; or the family members or estates of those killed while serving.  See ECF No. 1 (Compl.), ¶¶ 1, 149.  Plaintiffs believe that the relevant attacks were carried out by the Taliban or al Qaeda, and that these attacks resulted in part from material support provided by the Iranian government.  Id., ¶¶ 2, 11. They therefore seek damages from Iran and some of its instrumentalities for the deaths, physical pain, and mental anguish at the heart of this lawsuit.  Id., ¶¶ 1414–27.

Such damages could be recouped at least in part from the U.S. Victims of State Sponsored Terrorism Fund, which Congress established in 2015 to help compensate certain persons harmed by state-sponsored terrorism.  See Pub. L. No. 114-113, div. O, tit. IV, § 404, 129 Stat. 2242, 3007 (2015) (codified as amended at 34 U.S.C. § 20144).  Relevant here, the Fund provides payment for compensatory (but not punitive) damages awarded to those who hold a judgment against a designated state sponsor of terror pursuant to the FSIA terrorism exception. See 34 U.S.C. § 20144(c)(2)(A), (j)(3).  Congress seeded the fund with $1.025 billion dollars, id. § 20144(e)(5), the amount paid by a French bank for sanctions violations.  See Jennifer K. Elsea, Cong. Rsch. Serv., IF10341, Justice for United States Victims of State Sponsored Terrorism Act: Eligibility and Funding 2 (2023).  Since then, funds that would be available to satisfy Plaintiffs' awards have come from criminal penalties and civil fines imposed for violations of sanctions laws or other federal offenses arising out of business with a state sponsor of terrorism, as well

from proceeds arising from two court cases against Iran.  See 34 U.S.C. § 20144(e)(2)(A)–(B); U.S. Gov't Accountability Off., GAO-24-106863, <u>U.S. Victims of State Sponsored Terrorism Fund: Options for Increasing Deposits and Their Potential Impacts</u> 7–8 (2024); <u>see also</u> <u>id.</u> 6 & n.18, 7 & n.20 (noting $5.65 billion in congressional appropriations for specific classes that do not include Plaintiffs).  From these case-related deposits, the Fund received some $2.4 billion from fiscal years 2016 through 2023.  <u>See</u> U.S. Gov't Accountability Off., *supra*, at 8.

The Fund has paid out more than $7 billion, with another $2 billion set to be distributed by the end of this year.  <u>See</u> Press Release, U.S. Dep't of Just., <u>Justice Department Announces Anticipated Distribution of at Least $2B to Victims of State Sponsored Terrorism in 2025</u> (Apr. 29, 2025), https://perma.cc/AG6S-X8KZ.  The Fund is split 50/50 between 9/11 and non-9/11 claimants (like Plaintiffs), and payments from the two pools are allocated by a special master on a *pro rata* basis.  <u>See</u> 34 U.S.C. § 20144(d)(3).  If a claimant does not receive her full award amount — and thus far no one has — she can continue to receive payments in each subsequent round.  <u>See</u> U.S. Victims of State Sponsored Terrorism Fund, <u>Payment Report: Distributions One Through Four and 9/11-Related Lump Sum Catch-Up Payments</u> 7 (2024), https://perma.cc/YRA5-U344; U.S. Victims of State Sponsored Terrorism Fund, <u>Special Master's Report Regarding the Fifth Distribution</u> 14 (2025), https://perma.cc/GP8D-NGGM.  In the last few years, non-9/11 claimants have received only single-digit percentages of their award amounts.  <u>See</u> Fund, <u>Payment Report</u>, *supra*, at 7 (third and fourth rounds 5.84% and 0.40%, respectively).  In the last round, most were paid $160,000 or less.  <u>See</u> Fund, <u>Special Master's Report</u>, *supra*, at 13–14.

Last August, after Iran failed to appear and defaulted, Plaintiffs submitted a plan whereby they would pursue default judgment in four phases.  <u>See</u> ECF No. 21 (Case Mgmt.

Proposal) at 2.  They proposed that they first seek to establish Iran's liability for a small,

representative group of bellwether Plaintiffs by showing its involvement in the attacks that

harmed or killed them (phase one).  Id. at 2–4.  If the Court were to find Iran liable for these

bellwether attacks, it would then appoint Special Masters to determine damages (phase two).  Id.

at 5; see 28 U.S.C. § 1605A(e)(1) (permitting appointment of special masters "to hear damage

claims brought under" FSIA terrorism exception).  Plaintiffs proposed that those Special Masters

would also make recommendations as to liability (phase three) and, if necessary, damages (phase

four) for the non-bellwether Plaintiffs.  See Case Mgmt. Proposal at 5–6.  (Although, as noted,

this suit was originally brought by some 150 people, Plaintiffs now estimate that only about 50

will have a viable claim in light of our Circuit's decision in Borochov v. Islamic Republic of

Iran, 94 F.4th 1053 (D.C. Cir. 2024), which held that the FSIA terrorism exception did not apply

to personal-injury claims arising out of an attack in which no one was killed.  Id. at 1060–61; see

Mot. for Damages at 1 n.1; ECF No. 23 (MDJ) at 17 n.5.)

　　　　We find ourselves at stage one.  Plaintiffs have moved for default judgment as to the

bellwether attacks, asking this Court to hold Iran liable for eight attacks that harmed or killed ten

Americans between 2007 and 2015.  See MDJ at 11–15.  With the Court's approval, see ECF

No. 22 (Scheduling Order) at 1; ECF No. 29 (Apr. 25 Hrg. Tr.) at 5:6–21, they have also

proposed initial damage awards for the bellwether Plaintiffs, see Mot. for Damages at 17 tbl. A,

and moved the Court to appoint two Special Masters.  See ECF No. 26 (Mot. for Appointment of

Special Masters).  This Court initially told Plaintiffs that it anticipated releasing an Opinion on

bellwether liability by June and then turning to damages without the aid of Special Masters.  See

Apr. 25 Hrg. Tr. at 2:21–3:2, 5:6–21.  After further considering Plaintiffs' Motion for Default

Judgment, however, the Court held a hearing in which it explained that it was inclined to find

4

that Plaintiffs had not at this point successfully established Iran's role in the bellwether attacks.

See ECF No. 31 (May 9 Hrg. Tr.) at 1:19–24.  This Opinion expatiates on those concerns.

## II.    Legal Standard

Federal Rule of Civil Procedure 55(b) provides that unless the damages sought from a

defaulting party are "for a sum certain" or an amount "that can be made certain by computation,"

the plaintiff "must apply to the court for a default judgment."  Entry of a default judgment is not,

however, "automatic."  Mwani v. bin Laden, 417 F.3d 1, 6 (D.C. Cir. 2005).  In cases against a

defaulting foreign sovereign, the court must still determine that it has jurisdiction and that the

plaintiff has a sufficient legal and factual basis for his claims.  See Jerez v. Republic of Cuba,

777 F. Supp. 2d 6, 18–19 (D.D.C. 2011).  Specifically, the FSIA provides that a court cannot

enter default judgment against a foreign state "unless the claimant establishes his claim or right

to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e); accord Roeder v. Islamic

Republic of Iran, 333 F.3d 228, 232 (D.C. Cir. 2003).

The statute does not elaborate on what "that standard entails — that is, how much and

what kind of evidence" a court should consider satisfactory.  Han Kim v. Democratic People's

Republic of Korea, 774 F.3d 1044, 1046 (D.C. Cir. 2014).  At a minimum, a court "must draw

[its] findings of fact and conclusions of law from admissible testimony in accordance with the

Federal Rules of Evidence."  Id. at 1049 (quotation marks omitted); accord Owens v. Republic of

Sudan, 864 F.3d 751, 786 (D.C. Cir. 2017) ("If inadmissible evidence alone substantiates an

essential element of jurisdiction, then the court abuses its discretion in concluding the claimant

has established his case 'by evidence satisfactory to the court.'") (quoting 28 U.S.C. § 1608(e)),

vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan, 590 U.S. 418

(2020).  Our Circuit has instructed, however, that "courts have the authority" — and in fact the

"obligation" — to "adjust evidentiary requirements to differing situations" and should not erect evidentiary burdens that would allow a "state sponsor[] of terrorism [to] effectively immunize [itself] by killing [its] victims" and then "refusing to appear in court" or "subject itself to discovery." Han Kim, 774 F.3d at 1048 (cleaned up). For that reason, "the quantum and quality of evidence that might satisfy a court can be less than that normally required." Owens, 864 F.3d at 785. For instance, requiring a plaintiff in a terrorism-exception default case to "prove exactly what happened" may be too high a bar, "especially" when "direct evidence" of the terroristic act "will, by definition, almost always be unavailable, even though indirect evidence may be overwhelming." Han Kim, 774 F.3d at 1048. These elastic evidentiary standards, the Circuit has advised, are one "of the risk[s] a sovereign runs when it does not appear and alert the court to evidentiary problems." Owens, 864 F.3d at 786. With these principles in mind, the Court turns to whether Plaintiffs have satisfactorily surmounted the threshold barrier of Iran's sovereign immunity.

### III.    Analysis

Although Iran has failed to appear, the Court must still determine whether its presumptive sovereign immunity remains intact. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 n.20 (1983). It concludes that Plaintiffs have not shown that such immunity is abrogated because they have not satisfactorily established that Iran proximately caused the bellwether attacks at issue. As the Court therefore lacks subject-matter jurisdiction, it will not proceed to address any other jurisdictional or merits questions.

### A.    Causation

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in federal court." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989). In the

absence of a pre-existing international agreement dictating otherwise, a foreign state as well as its agencies and instrumentalities are immune from the jurisdiction of federal courts in civil actions unless one of the FSIA's enumerated exceptions applies.  See 28 U.S.C. § 1604.  A plaintiff suing a foreign state bears the initial burden of "producing evidence that an exception applies."  Bell Helicopter Textron, Inc. v. Islamic Republic of Iran, 734 F.3d 1175, 1183 (D.C. Cir. 2013).  If he does so, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply."  Id.; accord Chevron Corp. v. Ecuador, 795 F.3d 200, 204 (D.C. Cir. 2015).  In case of default, a court has subject-matter jurisdiction if the "plaintiff satisfies his burden of production" because a defaulting sovereign necessarily "fails to present any evidence in rebuttal."  Owens, 864 F.3d at 784.  If for whatever reason no exception applies, however, the court lacks subject-matter jurisdiction.  Wye Oak Tech., Inc. v. Republic of Iraq, 24 F.4th 686, 690 (D.C. Cir. 2022).

To establish Iran's sovereign immunity, Plaintiffs invoke the FSIA's terrorism exception found in 28 U.S.C. § 1605A.  In certain circumstances, it both waives the immunity of, and provides a private right of action against, a country (like Iran) that the Executive Branch has designated as a "state sponsor of terrorism."  Id. § 1605A(a)(2)(A)(i); U.S. State Dep't, Bureau of Counterterrorism, State Sponsors of Terrorism (accessed June 19, 2025), https://perma.cc/E37K-22YY.  The exception permits suits against such a state when, among other prerequisites, certain plaintiffs seek money damages

> [1] for personal injury or death that was [2] caused by [i] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or [ii] the provision of material support or resources for such an act if [3] such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

28 U.S.C. § 1605A(a)(1); <u>see</u> <u>id.</u> § 1605A(c) (providing right of action to defined class of plaintiffs for personal injury or death caused by such terrorist acts); <u>see also</u> <u>id.</u> § 1605A(h)(3) (defining material support, through incorporation of definition in 18 U.S.C. § 2339A(b)(1), to include "any property, tangible or intangible, or service, including currency . . . , lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation").

The rub here is whether the attacks were "caused by" Iran's material support. The D.C. Circuit has interpreted this phrase to mean that a plaintiff must show "proximate cause" to invoke the terrorism exception. <u>Kilburn v. Socialist People's Libyan Arab Jamahiriya</u>, 376 F.3d 1123, 1127–30 (D.C. Cir. 2004); <u>accord</u> <u>Owens</u>, 864 F.3d at 794. "[T]o say one event proximately caused another is a way of making two separate but related assertions." <u>Paroline v. United States</u>, 572 U.S. 434, 444 (2014). Most basically, it means that the first event was the "actual cause" (or "cause in fact") of the second, which means only that there was a "causal relation as laypeople would" see one. <u>Id.</u> (quotation marks omitted). But each "event has many causes," and "only some of them are proximate, as the law uses that term." <u>Id.</u> One event is the proximate cause of another if "it was not just any cause, but one with a sufficient connection to the result." <u>Id.</u>

For the terrorism exception to apply, then, there must be "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." <u>Owens</u>, 864 F.3d at 794 (quoting <u>Kilburn</u>, 376 F.3d at 1128). This proximate-cause inquiry "contains two similar but distinct elements." <u>Id.</u> The FSIA plaintiff must show that (i) the defendant's actions were "a 'substantial factor' in the sequence of events that led to the

plaintiff's injury"; and (ii) his injury was "'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." Id. (quoting Rothstein v. UBS, 708 F.3d 82, 91 (2d Cir. 2013)). The Court need not address whether Plaintiffs succeed on the second element because, as it now explains, they have not satisfactorily shown that Iran's provision of material support was a "substantial factor" leading to the bellwether attacks.

B.    Substantial Factor

According to Plaintiffs, all of the attacks at issue in this lawsuit — bellwether and not — were perpetrated by an insurgent group that was part of a "terrorist syndicate" in Afghanistan. See MDJ at 1. This syndicate, Plaintiffs maintain, comprised the Taliban; the Haqqani Network, which they describe as a "component" of the Taliban; al Qaeda; and the Kabul Attack Network, a "set of terrorist cells" composed of Taliban, Haqqani, and al Qaeda operatives. Id.; Compl., ¶¶ 31–86. For the eight bellwether attacks, however, Plaintiffs accuse only one insurgent group. They claim (1) that the attacks were perpetrated by the Taliban, and (2) that Iran's provision of material support to the group — in the form of arms, funding, training, and safe harbor — was a "substantial factor" in the attacks. See MDJ at 11–15, 20–25; ECF No. 25-1 (Expert Report of Michael Pregent), ¶¶ 58, 61, 65, 69, 74, 78, 81, 84, 87–88, 91. Plaintiffs' case for establishing a causal connection with Iran, then, also rests on establishing Taliban responsibility. Taking that tack is not strictly required. A plaintiff could in theory establish a causal connection with Iran without identifying which of several insurgent groups perpetrated the attack if the weapon used was one provided exclusively by Iran to those groups. Cf. infra pp. 16–17. Plaintiffs do not attempt such leapfrogging, however, and they never connect the attacks to the Taliban or to Iran.

The Court first discusses Plaintiffs' central evidentiary pillar: the expert report from Michael Pregent. It then explains in separate sections why the timing and location of the attacks

and their method do not convincingly demonstrate the links Plaintiffs seek to prove.  The Court next focuses on Plaintiffs' operational-capacity theory and concludes with an explanation of why judicial notice of other Afghanistan-related cases does not fill the gaps.

        1.     *Pregent Report*

To specifically link the bellwether attacks to the Taliban and Iran, Plaintiffs rely entirely on a single expert report from Pregent.  See MDJ at 11–15 (repeating for each attack: "As explained in Expert Pregent's report, Iran's material support and resources were a substantial factor leading to the attack that [injured or killed] [Plaintiff].") (citing Pregent Report).  Plaintiffs do suggest that their showing will be buttressed by another expert report, id. at 2, 25; yet while that report chronicles the devastating and often life-altering physical and psychological effects of improvised explosive devices (IEDs), it nowhere mentions the Taliban and only glancingly mentions Iran-backed groups.  See ECF No. 25-2 (Expert Report of Shean E. Phelps) at 9, 64–65.

Plaintiffs also indicate that "military documents" will bolster their case.  See MDJ at 25. In other cases, such documents have proven admissible and highly valuable — namely, when they reflect official investigations that touch on the attacks in question.  See, e.g., Cabrera v. Islamic Republic of Iran, 2022 WL 2817730, at *18 & n.18 (D.D.C. July 19, 2022) (explaining that "[a]fter the death of an active-duty soldier, the U.S. Army typically conducts an official investigation," the results of which often contain "the military chain of command's final assessment of the facts and circumstances of the death" and therefore can "provide more than enough information to attribute an attack to a particular terrorist group"); Karcher v. Islamic Republic of Iran, 396 F. Supp. 3d 12, 37, 44–45 (D.D.C. 2019) (relying on forensic evidence retrieved by military investigators to infer a certain type of explosive device used); Fritz v.

Islamic Republic of Iran, 320 F. Supp. 3d 48, 59 n.3 (D.D.C. 2018) (justifying admissibility of

military documents); see also Owens, 864 F.3d at 792 (same for State Department reports).  But

Plaintiffs do not appear to rely on any such investigations, and none of the military documents

they invoke connects the attacks to the Taliban (or Iran, for that matter).  See ECF Nos. 25-34,

25-37, 25-38, 25-39 (for attack on Sergeant Brian Leon-Guerrero, providing military awards and

Department of Defense death certificate listing death by blast injuries in Babo Kheyl,

Afghanistan); 25-6, 25-9, 25-10, 25-11 (for attack on Lance Corporal Jason N. Barfield,

providing awards; DOD death certificate listing death by blast injuries in Helmand Province,

Afghanistan; and Marine Corps investigation into his death that is almost entirely redacted);

25-15, 25-18, 25-19 (for attack on Staff Sergeant Christopher L. Brown, providing awards and

Army casualty report concluding killed in action by blast injuries in Khas Khonar, Afghanistan);

25-60, 25-62, 25-63 (for attack on Staff Sergeant Forrest B. Sibley, providing awards and DOD

death certificate that establish death from gunshot wound sustained while traveling through

Camp Antonik, Afghanistan); 25-25, 25-26, 25-27 (for attack on Specialist Joseph A. Gracia,

providing DOD separation paperwork and awards); 25-42, 25-43 (same for attack on Specialist

Steven Mormann); 25-69, 25-70 (same for attack on Specialist Jonathan Eugene Stephens).

Plaintiffs additionally move the Court to take judicial notice of facts already found by

other courts in this district — a request addressed later in the Opinion.  See infra Section III.B.5.

Relevant here, however, the factual findings in other cases all relate to Iran's general support for

the Taliban and other insurgent groups, not evidence that the Taliban and Iran were specifically

behind the bellwether attacks in this case.  See ECF No. 32 (Mot. Requesting Judicial Not.) at 3–

7.

Plaintiffs are left, then, with just Pregent's report.  Reliance on such an expert report is not in and of itself an issue.  Given the "dearth of firsthand evidence" typically available in terrorism cases, the "testimony of expert witnesses is of crucial importance."  Owens, 864 F.3d at 787.  The problem for Plaintiffs is that, unlike in many other cases, that report — and thus their evidentiary case — is skeletal.  Most importantly, Pregent's treatment of the bellwether attacks is cursory and rote.  To demonstrate why, the Court will focus principally on one of his attack analyses because doing so will offer an explanation of the defects that are common to each assessment.

Here, in its entirety, is Pregent's analysis of the second attack:

> 60. U.S. Army Sergeant (SGT) Brian Leon-Guerrero was killed on 10 July 2008 in Kapisa Province in an IED attack.  Brian was serving his fourth tour with the 3rd Platoon Alpha Company 1/294th Infantry Battalion when he was killed in action.

> 61. I attribute this attack to IRGC-QF [Iranian Revolutionary Guard Corps's Quds Force] and MOIS [Iran's Ministry of Intelligence and Security] Lethal Aid to the Taliban based on the attack method and the location of the attack in the Taliban stronghold of Kapisa Province.

> 62. The IRGC-QF and the MOIS were designated by the U.S. for providing lethal aid to the Taliban.  The IRGC-QF supplied and trained Taliban fighters on complex attacks using IEDs to maximize casualties when targeting U.S. Forces.

> 63. The IRGC-QF and MOIS were designated in 2007 by U.S Treasury for providing lethal aid to the Taliban specifically for the purpose of attacking Americans.

Pregent Report, ¶¶ 60–63.

As one can see, Pregent provides no direct evidence connecting the attack to the Taliban (or Iran).  Instead, he relies on circumstantial evidence: he attributes Leon-Guerrero's death to the Taliban and Iran "based on the attack method" (namely, its "complex" character) and the fact

that it occurred in a "Taliban stronghold." Id., ¶ 61. All of his other assessments likewise rest on one or both of these factors. Id., ¶¶ 58–59, 65–66, 69–70, 78, 81, 84–85, 88, 91 ("complex" attack); id., ¶ 74 (non-complex attack). Such reliance on circumstantial evidence is permissible — and perhaps to be expected here, given that the attacks occurred amidst an insurgency. Owens, 864 F.3d at 200–01. Yet there are several problems with Plaintiffs' circumstantial approach.

### 2. *Time and Location of Attack*

Start with the fact that the attack on Leon-Guerrero allegedly occurred in a "Taliban stronghold." Pregent Report, ¶ 61. Evidence that the attack took place in an area dominated by the Taliban (or one in which it conducted most of the attacks on U.S. and international forces) might well be persuasive evidence of Taliban culpability. Indeed, it is sometimes "possible to attribute an attack to a particular [insurgent] group based solely on geography and time because, at certain times and in specific locations, one [such] group had such an overwhelming presence that it is highly likely that group carried out any attacks there." Cabrera, 2022 WL 2817730, at *13; cf. Karcher, 396 F. Supp. 3d at 45 (concluding that attack was attributable to Iran in part because purpose of plaintiff's patrol in particular location was to locate weaponry used by Iranian-backed militias). But Pregent provides no evidence — only his say-so — that in July 2008 Kapisa Province was a Taliban "stronghold," a term he does not define. (Does it mean a stronghold *vis-à-vis* the Afghan government, other insurgent groups, or both?) Indeed, the sentence in the block quote produced above is essentially the entirety of the "stronghold" analysis presented to the Court for this or any other bellwether attack. See Pregent Report, ¶¶ 58, 61, 65, 69, 88, 91. Elsewhere in his report he states that he relied on "documents supporting the area of operations of specific Sunni and Shia groups receiving Iran-linked lethal

aid," id., ¶ 51, but he neither provides nor even describes those documents. It is therefore entirely unclear upon what basis he deduces that the Taliban had a stronghold in these locations when the attacks occurred.

That is not enough. In these circumstances, an expert's unsubstantiated *ipse dixit* is not "satisfactory" evidence. See 28 U.S.C. § 1608(e). If Plaintiffs are to rest their evidentiary case in part on which insurgent group controlled (or carried out most anti-coalition attacks within) a given location at a given time, they must substantiate that claim.

Doing so is not a tall order. For much of the war, the international military coalition, think tanks, and others tracked who — *e.g.*, the international forces, the Taliban, or a different insurgent group — controlled certain of Afghanistan's 34 provinces. See, e.g., Cabrera v. Islamic Republic of Iran, No. 19-3835, ECF No. 59-1 (Expert Report of William F. Roggio), ¶ 47 & pp. 18–20 figs.1–4 (D.D.C. Oct. 4, 2021). At times, the documentation was fine grained, tracking who controlled which district within a given province. See id., ¶ 47; Bill Roggio, Mapping Taliban Control in Afghanistan, Long War J., https://perma.cc/3BYW-J3XL. Operational dominance was, moreover, robustly documented by academic studies, journalistic accounts, and the scores of books that the long war produced. See, e.g., Int'l Crisis Grp., The Insurgency in Afghanistan's Heartland 18 (2011), https://perma.cc/CA7Y-AXG5 (describing Taliban's successful efforts in 2006–07 timeframe to make "substantial inroads" into Kapisa, where another insurgent group (Hizb-e Islami) had "strong historic ties," resulting in "clashes" between the two).

Indeed, plaintiffs in other cases have demonstrated a group's operational control of an area of Afghanistan during a specific time period with evidence that would be "satisfactory" to this Court. See 28 U.S.C. § 1608(e). In Cabrera, for instance, experts provided extensive written

and oral testimony as to which insurgent group controlled various parts of Afghanistan, enabling

Judge John Bates of this district to use a "sliding scale" to describe the level of certainty as to a

given group's "operational dominance" of an area.  See 2022 WL 2817730, at *13–15.  Such

inferences variously relied on contemporary reporting, U.S. government assessments, and claims

of responsibility by insurgent groups themselves, among other factors.  Id.; Cabrera, No. 19-

3835, ECF No. 63 (Transcript II) at 166:21–167:14 (D.D.C. Oct. 20, 2021).  Unlike here, the

expert assessments in Cabrera bracketed a group's operational dominance within a specific time

period.  See, e.g., Cabrera, No. 19-3835, ECF No. 59-2 (Expert Report of Dr. Colin Clarke) at

63–65 (D.D.C. Oct. 4, 2021) (explaining why Kabul Attack Network was dominant in Kabul

"prior to the emergence of competition from ISIS-K" in 2016); Cabrera, 2022 WL 2817730, at

*14 (citing Clarke Report at 63–65).  In doing so, they explained the nuances and limitations of

the evidence, marking a contrast with Plaintiffs' definitive representations that a given area was a

"stronghold."  The expert assessment principally relied upon in Cabrera acknowledged, for

instance, that there is occasionally a "dearth of information about Taliban activities in certain

provinces during some periods," and that it is sometimes possible to conclude only that the

Taliban more likely than not, as opposed almost certainly, had operational dominance in an area.

Cabrera, No. 19-3835, Clarke Report at 44; Cabrera, No. 19-3835, Transcript II at 169:10–25,

173:8–12.  Candor as to the limits of evidence — limits to be expected in a default terrorism-

exception case like this — inspires confidence in the expert assessment.

      Cabrera, in short, reveals the barebones — and thus unsatisfactory — nature of Plaintiffs'

evidentiary offering here.  Their unsubstantiated assertions that the bellwether attacks occurred

in "Taliban strongholds" does not suffice to establish Taliban culpability.  Compare Roth v.

Islamic Republic of Iran, 651 F. Supp. 3d 65, 92 (D.D.C. 2023) (declining to credit expert's

attribution of attack to Taliban and Iran because of insufficient evidence).

### 3. *Method of Attack*

Nor is the Court convinced by Plaintiffs' cursory attempt to implicate the Taliban and

Iran via the "method" of attacks.  To be sure, the tactics and weaponry used in an attack can

sometimes be powerful — even dispositive — evidence that a particular organization perpetrated

it and that a foreign state materially supported it.  The Iraq war, for instance, saw the widespread

use of a terrifying weapon known as an explosively formed penetrator (EFP).  Upon detonation,

an EFP projected a molten slug of copper, "often the size of a bowling pin and traveling at twice

the speed of a bullet," that was able to puncture the armor of U.S. military vehicles "like water

through snow."  Stanley A. McChrystal, My Share of the Task: A Memoir 426 n.252 (Penguin

2013).  "Inside the vehicle, the molten slug cut through legs and torsos, and its heat often lit the

cab and the men inside on fire."  Id. at 426–27 n.252.

Detailed expert explanations (some sealed for national-security reasons) enabled Judge

Colleen Kollar-Kotelly to conclude in Karcher that these weapons were a clear calling card of

Iran-backed Shi'a militias.  See 396 F. Supp. 3d at 25–30 & 26 n.14 (describing EFPs as these

militias' "signature weapon").  Among other factors, experts detailed how technically difficult it

was to construct an EFP and documented extensive official assessments that the materiel and

training necessary to produce EFPs came from Iran and Hezbollah.  Id. at 26–29 (explaining that

copper disk that transforms into slug "must be milled to a specific thickness and angle" and that

"average Iraqi Shi'a militia member" could not engineer an EFP "on his own") (quotation marks

omitted).  The court was therefore on solid ground when it concluded that the use of an EFP

indicated Shi'a militia involvement and "all but necessitate[d] the inference that Iran was

responsible." Id. at 30; see also Pennington v. Islamic Republic of Iran, 2021 WL 2592910, at

*4 (D.D.C. June 24, 2021) (this Court citing Karcher's analysis and additional assessments from

U.S. government officials that EFPs were "coming from" Iran); Roth, 651 F. Supp. 3d at 76, 80–

81, 90 (similarly relying on Karcher and attributing attacks partially on role of EFPs).

Plaintiffs here come well short of establishing that the methods in the bellwether attacks

compel the inference of Taliban responsibility and Iranian involvement. We can know that the

Taliban committed the attack on Leon-Guerrero and that it can be "attribute[d]" to Iranian "lethal

aid to the Taliban," Pregent says, because it was a "complex attack[] using IEDs," and Iran's

Quds Force "supplied and trained Taliban fighters" on that kind of attack. See Pregent Report,

¶¶ 61–62 (emphasis added). There are several problems with this claim.

For one, unlike in other cases, Pregent does not define what constitutes a "complex"

attack. Compare id., ¶ 39 (Pregent averring that Iran "provided training to Taliban

fighters . . . on complex attacks" but not elaborating), with Cabrera, No. 19-3835, ECF No. 59-3

(Expert Report of Lieut. Colonel (Ret.) Steven A. Wood), ¶¶ 68–70 (briefly describing complex

attacks); see also Cabrera, No. 19-3835, Clarke Report at 37–38 (defining "complex suicide

attacks"). Plaintiffs must at the very least explain how to identify a "complex" attack if they are

to argue that it is persuasive evidence of Taliban and Iranian involvement. Compare, e.g., M.M.

v. Islamic Republic of Iran, 708 F. Supp. 3d 22, 44 (D.D.C. 2023) (relying on expert's

assessment that "the type of bomb used in the attack" — truck "packed with a mix of plastic

explosives and ammonium nitrate" — was "a deadly cocktail signaling" Iranian support).

In addition, Plaintiffs do not provide any evidence that the attack on Leon-Guerrero in

fact was a complex IED attack. Pregent provides no description of the attack, see Pregent

Report, ¶¶ 60–63, and the Complaint says only that Leon-Guerrero's vehicle "was hit by an

[IED] of unknown size."  Compl., ¶ 320 (emphasis added).  Plaintiffs likewise offer no material details about some of the other attacks that Pregent either asserts are "complex," Pregent Report, ¶¶ 68–72 (Barfield), 73–76 (Brown); Compl., ¶¶ 1092 (Barfield "injured in an IED attack . . . in Sangin, Helmand Province"), 1185 (Brown "injured in an IED attack . . . in Kunar Province"), or attributes to Iran based on the attack method.  See Pregent Report, ¶¶ 90–91 (attributing ambush attack to Iranian lethal aid based on "complexity [of] the ambush" but noting only that it "involv[ed] small arms fire").  Plaintiffs provide only one narrative account of any attack, which they do by way of attaching several short write-ups.  See ECF Nos. 25-73 (blog post), 25-74 (U.S. Army press release), 25-75 (news story).

Even where Plaintiffs offer some description of a bellwether attack, however, Pregent does not attempt to justify why it qualifies as "complex."  Pregent Report, ¶¶ 57 (explaining only that attack on Gracia "involv[ed] a pressure plate anti-tank mine with a white phosphorous element"), 64 (explaining Mormann injured by "daisy-chained," command-detonated IEDs buried in such a way as to avoid detection but "do the most damage"), 77, 80, 83 (describing attack on Mouzon, Turner, and Powell as a vehicle-borne IED that "was detonated at the back gate in an attempted breach of the base").  Although the Court could surmise why such attacks were "complex," that is insufficient for Plaintiffs' burden.

In at least one case, moreover, the factual submissions are facially in tension.  Sibley's mother says that her son was killed at a checkpoint by an "Afghan Commando guard" — i.e., an ostensible ally, not an enemy.  See ECF No. 25-57 (Susan Fernandez Decl.) at 1.  The Complaint alleges that the gunman was a member of the Taliban merely "dressed in" an Afghan Army uniform, see Compl., ¶ 150; Pregent Report, ¶¶ 90–91 (attributing death to Taliban "ambush"), but not all such "insider" attacks took such a form.  The Taliban were indeed behind many of

these perfidious attacks, either by infiltrating the Afghan Army ranks, adopting a disguise, or co-opting a bona fide Afghan Army soldier; in other instances, however, such a soldier lashed out for personal motives without prodding or coercion from the Taliban.  See Javid Ahmad, West Point Modern War Inst., Dress Like Allies, Kill Like Enemies: An Analysis of "Insider Attacks" in Afghanistan, at 10–12 (2017), https://perma.cc/J4R8-ZLGH; see also Cabrera, No. 19-3835, Wood Report, ¶ 78–79 (citing this report as authority on insider attacks).  Plaintiffs do not explain upon what basis the Court can conclude Sibley's murder was an instance of the former.

  In short, the incomplete or nonexistent attack descriptions here are a far cry from the detailed and thoroughly documented accounts that have formed the basis of satisfactory evidence in other cases.  See Cabrera, No. 19-3835, Wood Report, ¶¶ 109–346 (providing detailed description of eleven bellwether attacks, explaining his level of certainty and bases for his conclusions, and relying heavily on U.S. military investigations of attacks, as well as interviews with victims and witnesses and insurgent claims of responsibility); Cabrera, 2022 WL 2817730, at *17–27 (relying principally on Wood's report); see also Karcher, 396 F. Supp. 3d at 30–45 (similar level of sourcing and detail for six EFP attacks).

  Third, setting aside the actual details of the attacks, Pregent does not explain why the attack methods he highlights should be attributed to the Taliban as opposed to a different insurgent group, nor why such method should, more importantly, implicate Iran.  Stick with complex attacks.  Plaintiffs have provided no evidence to believe that the Taliban was the only insurgent group that engaged in complex attacks during the years in question — and indeed the expert submissions to which they direct the Court's attention suggest otherwise.  See, e.g., Cabrera, No. 19-3835, Clarke Report at 37 (concluding that "Haqqanis handl[ed] most suicide

19

bombings and complex suicide attacks").  It is therefore far from obvious that a complex attack

should implicate the Taliban.

Even if one assumed Taliban responsibility for a given attack, moreover, Pregent does

not convincingly establish that <u>every</u> such attack by the Taliban in <u>any</u> province from 2007 to

2015 is attributable to Iranian lethal aid, which seems the upshot of his expert assessment of the

bellwether attacks.  Here, consider IEDs.  Even accepting that Iran provided the Taliban

extensive training and support on IEDs, other entities also critically supported the group's

development and deployment of IEDs.  <u>See, e.g.</u>, <u>Cabrera</u>, No. 19-3835, Roggio Report, ¶ 108

("Al Qaeda has embedded trainers with the Taliban" who "have provided instructions on tactics,

including how to wage urban warfare and the remote detonation and manufacturing of roadside

bombs (IEDs and EFPs)."); <u>see also</u> Antonio Giustozzi, <u>The Taliban at War: 2001–2018</u>, at 139–

40 (2019) ("innovation" in the ability to "deploy [IEDs] on a very large scale from 2006

onwards" depended in part on "Pakistani and Arab advisers," and documenting official estimates

that in 2011 "83% of IEDs used in attacks on U.S. troops were made with fertilizers produced in

Pakistan"); <u>id.</u> at 141–42 (documenting Taliban reports that they received industrially

manufactured mines and IED supplies from both Pakistan and Iran, and that "main source of

tactical innovation" allowing expansion of IED campaign were "Pakistani and Iranian foreign

advisers"); <u>id.</u> at 157 (describing an "IED development centre in Pakistan, where new techniques

were developed and tested"); Jeffrey Dressler, <u>Haqqani Network Influence in Kurram and Its</u>

<u>Implications for Afghanistan</u>, West Point Combating Terrorism Ctr., CTC Sentinel, Vol. 4, Issue

3, at 11, 12–13 (Mar. 2011) https://perma.cc/7ALF-GQVQ (reporting U.S. Special Forces

soldiers' assessment that Haqqani Network in Paktia province was employing "sophisticated"

IEDs "provided" by Pakistani security services).  To be sure, if a Taliban attack were, under the

proximate-cause standard, attributable to material support from both Iran and another entity, then the terrorism exception would still strip Iran's immunity.  See Kilburn, 376 F.3d at 1127–29 & n.2 (rejecting "restrictive" causation standard that would "absolve" all "joint tortfeasors," meaning foreign state can be stripped of immunity even if another entity also proximately caused the injury or death).  But Plaintiffs' evidence does not permit the Court with any certainty to rule out that the bellwether IED attacks are solely attributable to material support from an entity other than Iran.

It is even more dubious to attribute every small-arms ambush to Iranian lethal aid.  See Pregent Report, ¶¶ 90–91.  Given that it was a ubiquitous and relatively lower-skill form of attack, see, e.g., Jerry Meyerle & Carter Malkasian, CNA, Insurgent Tactics in Southern Afghanistan: 2005-2008, at 3, 6 (Aug. 2009), https://perma.cc/9PRF-SLQ9 (explaining that "[a]mbushes have been a staple of Afghan insurgent tactics since the war against the Soviets in the 1980s," and that in Helmand from 2006–08, "insurgents persistently targeted foot patrols in snap ambushes carried out by small groups"); Cabrera, No. 19-3835, Roggio Report, ¶ 207 ("Engaging and successfully downing helicopters is a much more complex task than, say, an ambush or detonating an IED."), it is hardly obvious that any ambush should be traced back to training or weaponry provided by the Iranian government.

Plaintiffs might, however, respond that it is indeed correct that Iran proximately caused every ambush or IED attack perpetrated by the Taliban during the years in question because its provision of material support increased the organization's overall operational capacity, and that fact is enough to establish proximate cause.  To that argument the Court now turns.

21

4.    *Operational-Capacity Theory*

To recap briefly, Plaintiffs rely on Pregent's assessment to connect the bellwether attacks to Iran, and he purports to draw that connection based on the fact that each attack was perpetrated by the Taliban and bears the hallmarks of Iranian support.  For Leon-Guerrero, for example, Plaintiffs say that it was a complex IED attack and that the Quds Force "supplied and trained Taliban fighters on complex attacks using IEDs to maximize casualties when targeting U.S. Forces," Pregent Report, ¶ 62, so it follows that Iranian material support was "a substantial factor in the sequence of events that led to" his death.  Owens, 864 F.3d at 794 (quotation marks omitted).  Plaintiffs' evidentiary case for the bellwether attacks therefore appears to rely principally on connecting Iranian material support <u>directly</u> to the attack: Iran trained and supplied the Taliban on a certain tactic, and the Taliban used that tactic in the bellwether attack. For the reasons described in the previous two sections, Plaintiffs have not yet established that conclusion with satisfactory evidence.

For the terrorism exception to apply, however, it need not be the case that the material support directly enabled the specific attack underlying the claim.  The exception, recall, waives sovereign immunity for claims arising from a terroristic act or from "the provision of material support or resources . . . <u>for</u> such an act." 28 U.S.C. § 1605A(a)(1) (emphasis added).  The D.C. Circuit has interpreted this phrase to mean that when a plaintiff bases his terrorism-exception claim on material support, such support need not "go directly for the specific act" in order to have proximately caused it.  Kilburn, 376 F.3d at 1130; accord Owens, 864 F.3d at 799.  In justifying this interpretation, the Circuit explained that requiring material support to "be <u>directly</u> traceable to a particular terrorist act" would in certain circumstances "likely render [§ 1605A's] material support provision ineffectual."  Kilburn, 376 F.3d at 1130.  That would be the case, for

example, when the material support took the form of "financial assistance" because money is "fungible, and terrorist organizations can hardly be counted on to keep careful bookkeeping records." Id.; see also Owens, 864 F.3d at 798–99 (repeating this reasoning).

Extrapolating from that holding, courts in this district have found proximate cause when a state's material support increased the capacity of a terrorist group to perpetrate attacks. See, e.g., Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 368 (D.D.C. 2020); Schwartz v. Islamic Republic of Iran, 2020 WL 7042842, at *14 (D.D.C. Nov. 30, 2020); Selig v. Islamic Republic of Iran, 573 F. Supp. 3d 40, 61 (D.D.C. 2021); Cabrera, 2022 WL 2817730, at *39–40. In Owens v. Islamic Republic of Sudan, 826 F. Supp. 2d 128 (D.D.C. 2011), for example, Judge Bates found that Sudan had proximately caused the 1998 embassy bombings in Kenya and Tanzania perpetrated by al Qaeda because Sudan had "provided the safe harbor necessary to allow al Qaeda to train and organize its members for acts of large-scale terrorism from 1992 to 1996." Id. at 151; see also id. at 146. In affirming, the Circuit found that Sudan's actions in the early 1990s — sheltering al Qaeda, facilitating its movement, and connecting it with "more experienced terrorist groups" — "allowed al Qaeda to grow its membership, to develop its capabilities, and to establish the cells in Kenya and Tanzania, which ultimately launched the 1998 bombings." Owens, 864 F.3d at 797.

Plaintiffs' Motion invokes this operational-capacity theory. See MDJ at 22–24. It is not entirely clear, however, whether they mean to rely on this theory for the bellwether attacks; as just noted, for such attacks, they point solely to Pregent's report, and he seems to rely on the notion that Iran's material support directly enabled the specific attacks. To the degree that Plaintiffs do mean to rest their bellwether case on the operational-capacity theory, however, the Court is not persuaded.

23

In their Motion, Plaintiffs contend that, as a matter of law, the "provision of weapons, funding, safe harbor, and training to a terrorist group, thereby increasing the group's capabilities, is a substantial factor in subsequent attacks committed by that group." MDJ at 22. That is, they seem to maintain that any type of material support to a terrorist organization proximately causes any later attack, full stop, regardless of the organizational structure of the group or the specific capability on display in the attack. Plaintiffs further argue that "the evidence will demonstrate" that Iran provided the just-mentioned forms of material support to the Taliban. Id. at 25. (The Court need not interrogate that point for the present purpose of demonstrating the limits of the operational-capacity theory, but it will address the shortcomings of their evidentiary case on that score below. See infra Section III.B.5.) Plaintiffs therefore appear to maintain that Iran's material support enhanced the operational capacity of the Taliban writ large in such a way that such support — regardless of the form it took — can be considered a substantial factor for any type of attack by any component of the Taliban in any area of Afghanistan at any time between 2001 and 2015. The Court cannot accept such a blanket proposition.

During the years at issue in this case, the Taliban was a large, dispersed, and often decentralized insurgent group — or so say the expert submissions that Plaintiffs ask this Court to judicially notice, see MJN at 3–7, as well as the articles and books those experts relied upon. The Court will not here attempt a treatise on the Taliban's structure when it waged an insurgency, not least because it was complex, evolved, and remains a matter of some debate. See Giustozzi, supra, at 3 (noting "extreme complexity of the Taliban's organisational apparatus"). The Court can make the point through a short — and extremely simplified — discussion.

Consider, for instance, the expert report of Colin Clarke (from Cabrera), which provides the most extensive analysis of the Taliban's structure and relies heavily on the work of Antonio

Giustozzi to do so.  See Cabrera, No. 19-3835, Clarke Report at 10–14, 23–35 (frequently citing

Giustozzi, *supra*).  Clarke repeatedly emphasizes the "decentralized" nature of the Taliban

insurgency, see, e.g., id. at 23, 24, 26, including in his description of its basic organization.  As

the insurgency matured, in Clarke's account, a central leadership council known as the Rahbari

Shura (or Quetta Shura, given its seat in Quetta, Pakistan), came to oversee five regional shuras

(councils) with responsibility for operations in different parts of Afghanistan.  Id. at 24–34;

accord Cabrera, No. 19-3835, Roggio Report, ¶¶ 51, 203; see also Giustozzi, *supra*, at 162

(noting that at times regional shuras "overlapped geographically" and competed for

responsibility over territory).  In general, these "regional shuras exercised substantial control

over" operations in their respective territory.  Cabrera, No. 19-3835, Clarke Report at 26.  They

in turn "embraced different structures to oversee their operations, personnel, and resources."  Id.

In some, "decentralized" fighting units — known as a *mahaz*, or front — "played key roles";

"[i]n others, command and control became highly centralized."  Id.; see id. at 28.

Expert accounts that Clarke relies upon also suggest a certain degree of decentralized —

and even siloed — organization during the time period of the bellwether attacks.  Two examples

suffice.  Giustozzi concludes that the Taliban were "peculiar" among "most well-studied

insurgent movements" "insofar as they [were] markedly polycentric" when waging the

insurgency.  See Giustozzi, *supra*, at 4.  For instance, from 2005 to 2009, although centrally

appointed "shadow" governors were ostensibly in charge of all Taliban activities in a province,

the insurgency in fact largely revolved around *loy mahazes* (large fronts).  Id. at 60–62; see id. at

63, 65.  Typically several thousand strong, a large front formed around a "charismatic" Taliban

fighter, was mobile, had its "own complex internal chain[] of command,"  id. at 62–63, and,

while it received funds from the Rahbari Shura, it could also fundraise directly from foreign

donors — indeed, some of these patrons would only donate to their favored front.  Id. at 62, 63,

65, 68.  A study published during the tail end of this period reported that in Uruzgan, the Taliban

were "roughly divided into two geographically separate networks," and that while both

"report[ed]" to the Taliban shadow governor and ultimately to Pakistan-based leadership above

him, "[c]ommanders from one [network] seem[ed] only rarely to cross over to the other side for

operations or consultation, which suggests that there is little direct coordination or cooperation

between the networks."  Martine van Bijlert, Unruly Commanders and Violent Power Struggles:

Taliban Networks in Uruzgan, in Decoding the New Taliban: Insights from the Afghan Field, at

155, 164–66 (Antonio Giustozzi ed., 2009); see also Cabrera, No. 19-3835, Clarke Report at 55

(citing this report for discussion of Uruzgan).

     To be sure, a decentralized structure does not mean an entirely "fragmented" one, see

Giustozzi, supra, at 7, and, from atop the regional shuras, the Rahbari Shura managed a certain

amount of centralized control to varying degrees over the course of the war.  See, e.g., Cabrera,

No. 19-3835, Clarke Report at 25, 33 (describing efforts to centralize finances by collecting

locally raised revenue and strategically dispensing funds) (citing Gretchen S. Peters, The Taliban

and the Opium Trade, in Decoding, supra, at 7, 13); Giustozzi, supra, at 159–95 (describing

efforts to impose "a more hierarchical, unified system of command and control").

     In light of these organizational features, however, it is not obvious why the Court should

infer that material support received by one component of the Taliban would necessarily have

enhanced the operational capacity of another — or all components.  Nor do Plaintiffs maintain

that every component received weaponry, training, financial support, and safe haven from the

government of Iran.  See MJN at 4 (listing these as "main types of material support" provided by

Iran).  In fact, the cursory contents of the State Department reports upon which Plaintiffs rely

suggest otherwise.  See U.S. State Dep't, <u>Country Reports on Terrorism 2009</u>, at 192 (Aug.

2010), https://perma.cc/26ZV-FYL8 ("Iran has arranged arms shipments to <u>select</u> Taliban

members.") (emphasis added); U.S. State Dep't, <u>Country Reports on Terrorism 2012</u>, at 196

(May 2013), https://perma.cc/GA52-FYWL (same); <u>id.</u> (identifying only one province —

Kandahar — where Iran "ha[d] shipped a large number of weapons" in an effort "to increase its

influence in this key province"); <u>see also</u> <u>Cabrera</u>, No. 19-3835, Roggio Report, ¶ 207

(describing reports that Iran recruited Taliban forces <u>from Kunar</u> to be trained on how to shoot

down Coalition forces helicopters); Giustozzi, *supra*, at 141 (describing Iran's provision of

industrially manufactured mines to the Haqqani Network in 2010–12 timeframe); <u>id.</u> at 142

(describing Taliban sources saying influence of Pakistani and Iranian training on IEDs "was felt

mainly in the west, but also as far away as Nangarhar" because "eastern Taliban" received

training).  Plaintiffs in fact gesture towards the importance of the Taliban's internal structure

when they suggest that "the operations of and relationships between each of [the Taliban's]

component members" are relevant and require exposition.  <u>See</u> MDJ at 11 (promising,

incorrectly, that Pregent's report "explains" these issues).

        To demonstrate the Court's concern, consider tactical training.  Plaintiffs contend, as an

example, that Iran trained the Taliban on complex attacks, including vehicle-borne IEDs (car

bombs) and suicide attacks using body-worn IEDs (suicide vests).  <u>See</u> Pregent Report, ¶¶ 39–

40.  (The Court assumes as much for this discussion.)  Such training plainly made those who

received it — either directly, second hand, or fifth hand — "more lethal in their attacks against

U.S. military and civilian personnel."  <u>Id.</u>, ¶ 40.  In that sense, the training indisputably enhanced

the capacity of at least some Taliban component(s) to commit a certain kind of attack.  Were

such a component to later commit an attack with a suicide vest, it would be safe to conclude that

Iran's training proximately caused the attack even if Iran did not provide the training specifically for that attack. That would be true even if, say, the Taliban fighters who received the suicide-vest training first hand were long dead by the time of the attack, but their know-how had made its way to their replacements, and either they or others they had trained committed the attack. Because such training was transferrable within a component — and thereby increased the component's capacity to commit a suicide-vest attack — the training can be considered "a substantial factor in the sequence of events that led to" the suicide-vest attack, even it occurs years after the training took place. Cf. Owens, 864 F.3d at 795–96 (rejecting contention that an otherwise existing "chain of proximate causation" was "broke[n]" by a several-year interval).

At this point, however, it appears an untenable leap to say that any suicide attack committed by any faction of the Taliban was (or even likely was) proximately caused by Iran's training. That is, Plaintiffs have not established that the training Iran provided — on suicide-vests or anything else — permeated the entire Taliban, either by being transferred across components or disseminated from on high. That may well be the case for certain kinds of tactical training during certain periods of the war, see, e.g., Giustozzi, *supra*, at 157 (concluding that during 2002–09 period when Taliban significantly adapted tactics, "innovation was primarily driven by decisions taken at the leadership level, then transmitted down the hierarchy"); id. at 176–78 (noting that "when the insurgency started" in 2003–04, Taliban had no "training capabilities," but "[e]ventually all Taliban recruits were sent to training courses" and "training was usually imparted by foreigners"), but Plaintiffs would have to establish as much through satisfactory evidence. Indeed, Plaintiffs would have to grapple with accounts that suggest that many suicide bombs were, at least in the early years of the insurgency, not traceable to Iranian material support. See Giustozzi, *supra*, at 144–46 (attributing introduction of suicide

bombing in Afghanistan in 2004 to the Haqqanis — who "received the support of Pakistani and Arab advisers" and initially relied on "Pakistani engineers [to] prepare[] the bombs" — and noting early resistance of certain Taliban factions to the tactic); Cabrera, No. 19-3835, Clarke Report at 37 (Haqqanis "initially learned the tactic from al Qaeda"); see also Carter Malkasian, The American War in Afghanistan: A History 118 (Oxford 2023) ("More than anyone else, [Taliban Commander] Dadullah [Lang] introduced suicide bombings to Afghanistan," including by bringing "experienced Iraqi insurgents to the Pakistani tribal areas to teach [Taliban fighters] the latest tactics and technology.").

To put the Court's concerns slightly differently, it is not convinced that every type of material support is equally fungible, nor always fungible in a way that renders immaterial the reality of a given group's organizational structure and footprint — here, the Taliban's dispersed and at times decentralized nature.

The Court is well aware that money is fungible. That fact was central to the Circuit's rejection of the notion that causation obtains only if the support was for the attack giving rise to the claim. Kilburn, 376 F.3d at 1130. Even with money, however, the Court foresees limits. On the one hand, there is financial assistance that functions as a kind of seed investment. Funds (or, for that matter, safe haven) provided to an organization that are critical to its growth or survival would presumably be a substantial factor in any attack later committed by one of its constituent cells, even if at the time of the attack the organization was decentralized and siloed. Cf. Owens, 864 F.3d at 797 (provision of safe haven to al Qaeda in Sudan helped it establish cells in Kenya and Tanzania that years later perpetrated the embassy bombings); Owens, 826 F. Supp. 2d at 146 (same). That may well hold true for the funds (and safe haven) provided by Iran to the Taliban. If Plaintiffs intend to rely on that proposition, however, they must justify it.

On the other hand, even with financial assistance, there are instances when the organizational structure of the group might preclude proximate causation. For example, based on what Plaintiffs have thus far produced, is not a foregone conclusion that if funds were provided directly to a Taliban commander in, say, Herat, such funds would necessarily increase the capacity of a faction operating on the other side of the country in Nangarhar. Cf. Cabrera, No. 19-3835, Roggio Report, ¶ 225 (describing reports that Iran provided payments to certain Taliban commanders "to distribute among their units as needed to fund their operations"); id., ¶ 227 (describing how funds flowed from liaison in Tehran to commander of Taliban's Northern Zone, who then used the money to facilitate attacks in certain provinces). One could conclude as much if the two components' finances were somehow connected — for example, if both components relied even in part on a higher command for resources, such that an influx of funds to the Herat component freed the command to dedicate more money to the faction in Nangarhar. Again, that may well describe the Taliban, at least during certain periods of the insurgency. See Peters, *supra*, at 7, 13 (describing in 2009 how money made through opium trade could move both up and down the Taliban hierarchy, such that "[s]ub-commanders from poppy rich areas might have to pay into the central coffers, while others in strategic regions with less earning potential might collect a monthly stipend for operational expenses"); see also Giustozzi, *supra*, at 48–50 (describing how shortly after Taliban "absorbed" "endogenous" insurgent groups in Herat in 2007, IRGC began financing Herat-based groups, which was critical development because "the Taliban in the west no longer had to compete with the south for the allocation of resources"). It falls on Plaintiffs, however, to grapple with these nuances. Cf. Holder v. Humanitarian L. Project, 561 U.S. 1, 30–31 (2010) (emphasizing that material support for lawful

conduct provided to terrorist organization enables its unlawful conduct when organization "do[es] not maintain organizational" or "financial firewalls") (emphasis omitted).

Beyond the question of organizational structure, the Court is also not convinced that all forms of material support are as fungible as money, such that provision of one kind necessarily enhances the group's ability to commit any kind of attack.  See Force, 464 F. Supp. 3d at 368 (explaining lack of need to establish "nexus" between material support and specific attack "because funds — and, in certain instances, arms and other support — are fungible") (emphasis added).  For instance, just because Iran provided technical training and materiel that enabled the capacity of a Shi'a militia to employ EFPs, see supra p. 16, does not necessarily mean that such support enabled the same militia to carry out a small-arms ambush or a kidnapping.  To say as much is not to resist the operational-capacity theory; it is instead to observe that although the material support need not directly enable the specific attack in question (i.e., it is enough that the material support enhanced a group's capability to commit the attack), there must still be a nexus between the enhanced capability and the attack.

The Court recognizes that this position is potentially at odds with that taken by other courts in this district, including in other Afghanistan-related cases where courts seem to speak more abstractly about the Taliban's overall capacity.  See, e.g., Selig, 573 F. Supp. 3d at 61 (although expert could not "precisely determine the full impact of Iran's support for the Taliban" nor "tie the provision of specific support" to the attacks, it was "enough" that "Iran's financial and military aid . . . played a significant role in aiding [the Taliban's] operational capacity") (quotation marks omitted).  Indeed, in Cabrera, Judge Bates appeared to endorse the idea that because Iran at various times and in various ways provided material support to members of the terrorist "syndicate" in Afghanistan, any attack by a member was thereby proximately caused by

31

Iran.  See 2022 WL 2817730, at *40.  "Iran's support was fungible between members of the [s]yndicate," he reasoned, "and it eliminated the need for those members to compete with each other for resources."  Id.  Thus, "[s]upport for one element of the syndicate that came from Iran didn't have to be distributed to the others" for them to have "all received the support. . . . There was a synergy."  Id. (emphasis added) (quoting testimony of Roggio); see also Cabrera, No. 19-3835, Roggio Report, ¶ 256 ("Iran's provision of material support to any part of the Syndicate resulted in benefit to the entire Syndicate, because money, weapons, and training are all fungible.").

This Court cannot at this point go that far.  Even crediting that such a syndicate existed, see Cabrera, 2022 WL 2817730, at *6, whether one of its members benefited from material support provided to another is an empirical question that turns on the nature of the support and the syndicate's structure at that time.  Cf. Holder, 561 U.S. at 29 (internal structure and operations of "foreign terrorist organizations . . . is an empirical question").  Were it otherwise — that is, were material support deemed definitionally fungible across years, provinces, and organizational divides such that support to a Taliban component in Kunar in 2005 enhanced the operational capacity of the Kabul Attack Network in 2015 — then it is hard to see how any attack during the twenty-year war in Afghanistan cannot be attributed to Iran.  The Court struggles to understand how, in that proposition, the causation requirement (proximate or actual) plays any real role.

Indeed, it is one thing to say that the syndicate benefited from a kind of "synergy," Cabrera, 2022 WL 2817730, at *40, in terms of its overall operational and strategic impact.  After all, a spectacular car bomb in Kabul could kill the same number of people and strike the same quantum of fear — and thus equally advance the syndicate's goals — regardless of whether

a Haqqani or an al Qaeda operative pressed the detonator.  But who perpetrated the attack and whether Iranian material support at minimum enhanced their capacity to do so <u>does</u> matter for purposes of determining whether such support was an actual and proximate cause of the attack. Even if all members of the syndicate benefited from the <u>results</u> of an attack perpetrated by one member, it does not necessarily follow that they all benefited from material support provided one member.

* * *

In sum, Plaintiffs have not yet satisfactorily shown that Iranian material support was a proximate cause of the bellwether attacks.  Their attempt to establish such causation based on the location and method of attack is in several respects under-developed.  <u>See</u> *supra* Sections III.B.2–3.  Nor is the Court persuaded that Plaintiffs can rest their evidentiary case on the proposition that because Iranian material support increased the operational capacity of the Taliban writ large, each bellwether attack is as a matter of course attributable to Iran.  <u>See</u> *supra* Section III.B.4.  Instead, Plaintiffs must at the least demonstrate with satisfactory evidence that Iran's material support increased the operational capacity of the culpable Taliban component to carry out the kind of attack at issue.  To do so, they would not likely need to "prove <u>exactly</u>" how material support flowed within and between components of the Taliban, <u>Han Kim</u>, 774 F.3d at 1048 (emphasis added), if — as seems likely — that was difficult to track at the time and even harder to retrace now.  But the Court must have enough evidence to reasonably infer that Iran's material support helped the component behind the attack perpetrate it.  <u>Id.</u> (holding plaintiffs need not "prove exactly" what happened when they "produced compelling, admissible evidence" that allowed court to "assume that the defendant probably" committed alleged act).

5.    *Judicial Notice*

In Plaintiffs' Motion for Default Judgment and a second Motion filed after this Court expressed its reservations as to the evidence they had mustered, they ask this Court to take judicial notice of several related cases.  See MDJ at 27–28; MJN at 2–7.  Specifically, they observe that other courts have concluded that Iran provided significant material support to the Taliban and other insurgent groups in Afghanistan.  See Cabrera, 2022 WL 2817730, at *9–12; Selig, 573 F. Supp. 3d at 53–55; Roth, 651 F. Supp. 3d at 76–77; Brown v. Islamic Republic of Iran, 687 F. Supp. 3d 21, 33–34 (D.D.C. 2023).  Plaintiffs ask this Court to judicially notice these and other decisions pursuant to Federal Rule of Evidence 201.  See MJN at 2–7.  That rule permits courts to take judicial notice of an "adjudicative fact" that is "not subject to reasonable dispute" and is either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(a)–(b).

The Court is certainly aware of these decisions, but that hardly provides Plaintiffs the silver bullet they envision.  For one, just because the Court can consider the admissible evidence presented in those cases does not mean it must automatically accept all factual (let alone legal) conclusions that those courts drew from such evidence.  Contra MJN at 2 ("request[ing] that the Court take judicial notice of prior legal rulings that addressed and resolved" relevant factual issues) (emphasis added).  As Judge Royce Lamberth has elsewhere ably explained, although our Circuit has not weighed in, the consensus is that courts typically cannot take judicial notice of prior proceedings "for the purpose of accepting the truth of the earlier court's findings and conclusions."  Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).  While doing so "is not prohibited *per se*," it is appropriate only if there is "some particular

indicia of indisputability," and that will rarely describe dispositive factual determinations in a default-judgment FSIA case where the court lacked "the full benefits of adversarial litigation." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 59–60 (D.D.C. 2010).  Such determinations therefore "should not be assumed true beyond reasonable dispute."  Id. at 60.  In FSIA litigation, then, courts may properly "rely upon the evidence presented in earlier litigation — without necessitating the formality of having that evidence reproduced — to reach their own, independent findings of fact in the cases before them."  Rimkus, 750 F. Supp. 2d at 172.  They may, in other words, take judicial notice of "what the evidence was," but they cannot rotely accept "the subjective determination of what that evidence means."  Id. (emphasis added).

What is more, while Plaintiffs may indeed rely upon expert submissions in other Afghanistan-related cases, they must still marshal those submissions in support of their claims — namely, by shoring up the gaps in their evidentiary case and grappling with the nuances the Court identified above.  See supra Sections III.B.3–5.  For instance, if Plaintiffs are to maintain that a complex IED attack implicates Iranian material support, they must demonstrate how expert submissions from other cases support that position.  It will not do to merely invoke those submissions and expect the Court to connect the dots unaided.  Jeffries v. Barr, 965 F.3d 843, 220–21 (D.C. Cir. 2020).

In addition to relying on the expert submissions from other cases, Plaintiffs may wish to reinforce their own.  The Court has already identified several ways in which the treatment of the bellwether attacks in Pregent's report is threadbare, particularly set in relief against presentations in other FSIA cases.  See supra Sections III.B.2–3.  There are, moreover, several methodological issues plaguing that report's discussion of Iranian material support.  The Court identifies a couple here.

Pregent's report primarily relies on governmental reports or assessments of Iran's support to the Taliban, see Pregent Report, ¶¶ 34-50, but these are often high-level summaries that lack any detailed description of the kind of tactical training or weaponry Iran provided.  Nor do the reports always support his claims.  For instance, he cites a State Department report for the proposition that Iran provided the Taliban "advanced training in Iran" on "complex ambushes." Id. ¶ 34 & n.20.  But the portion that he cites comprises two short sentences, says Iran provided training to the Taliban "in Afghanistan," and does not mention "complex ambushes."  Country Reports on Terrorism 2009, supra, at 192 (Aug. 2010).  Such discrepancies do not engender trust.

There are also temporal incongruities.  Each of his attack analyses relies on the claim that Iranian instrumentalities "were designated in 2007 by U.S Treasury for providing lethal aid to the Taliban specifically for the purpose of attacking Americans."  Pregent Report, ¶¶ 63, 67, 72, 76, 79, 82, 86, 89, 93.  (He does not appear to anywhere support this claim with a citation.)  That designation might provide support for the bellwether attack that occurred in 2007, id., ¶¶ 57–59, but it is questionable support for the nine that occurred later.  Id., ¶¶ 64–93 (attacks in 2009, 2011, 2013, and 2015).  Separately, he relies on a 2007 State Department report to say that "[s]ince at least 2006" — i.e., presumably from 2006 to the report's date of October 2024 — Iran has shipped weapons to the Taliban.  Id., ¶ 36.  While he cites later State Department reports from 2010 and 2013 that repeat this formulation, see id. at 9 nn.20, 23, they do so in a single, cursory sentence.  See Country Reports on Terrorism 2009, supra, at 192; Country Reports on Terrorism 2012, supra, at 196.  It is thus hard to understand upon what basis Pregent says that bellwether attacks in 2011 and 2012 "took place at time when [Iran was] at the height of

providing lethal aid to the Taliban across Afghanistan in order to injure and kill U.S. personnel."
Pregent Report, ¶¶ 71, 75.

In sum, the analysis of Iran's material support in Plaintiffs' expert report is incomplete
and in places slipshod. While the Court may also consider expert submissions from other cases,
that only gets Plaintiffs so far: they must still show that such submissions support their various
evidentiary claims. In default cases, where Plaintiffs' theses are untested by an adversary, the
Court expects scrupulous adherence to the facts and should not have to mine the historical record
to identify errors or exaggerations.

* * * * *

As Plaintiffs' declarations make indelibly clear, the gunshots and explosions at issue in
this case continue to reverberate years later. The loss of a soldier rends a family — sending his
father deep into a hole of anger and grief, casting a pall of silence over his shocked parents,
driving his younger sister to withdraw into lonely despair. See ECF No. 25-3 (Raymond
Madison Barfield Decl.) at 1–3; see also Fernandez Decl. at 2. More than a decade after the dust
cloud cleared, an IED blast consigns its victim to chronic pain and psychological turmoil —
depression and flashbacks by day, insomnia at night. See Compl., ¶¶ 440–41; ECF No. 25-40
(Cody Mormann Decl.) at 2. The Court recognizes and indeed honors the incredible emotional
and physical pain that Plaintiffs endure even as it holds — as it must — that they have not yet
succeeded in this lawsuit. It may very well be that they can show Iran legally caused their
anguish. If so, then Congress has determined that Iran may be sued and Plaintiffs are entitled to
damages. If that is indeed what they are due, however, then it falls to Plaintiffs and their counsel
to mount a more substantial case.

**IV.    Conclusion**

For the foregoing reasons, the Court will deny without prejudice Plaintiffs' [23] Motion for Default Judgment, [26] Motion for Appointment of Special Masters, and [30] Motion for Damages.  It will grant their [32] Motion Requesting Judicial Notice subject to the caveats described above.  A separate Order so stating will issue this day.

*/s/ James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 14, 2025